1  LEADER-PICONE & YOUNG, LLP
   MALCOLM LEADER-PICONE (State Bar No. 104620)
2  1970 BROADWAY, SUITE 1030
   OAKLAND, CA  94612
3  TELEPHONE:  510-444-2404
   FACSIMILE:  510-444-1291
4  EMAIL:      mlp@leader-picone.com

5  Attorneys for Plaintiffs
   KI HYUNG OH and JAI HEE OH
6

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSÉ DIVISION

| | |
|---|---|
| In re<br><br>TEA SUN YOON,<br><br>    Debtor.<br>_____<br>KI HYUNG OH and JAI HEE OH,<br><br>    Plaintiffs,<br><br>vs.<br><br>TEA SUN YOO,<br><br>    Defendant.<br>_____ | Adv. Case No.: _____<br><br>Case No.:  20-51481 MEH 7<br>            Chapter 7<br><br>**ADVERSARY COMPLAINT TO DENY DISCHARGE [11 U.S.C. § 727(a)(4)] and TO DECLARE DEBT NON-DISCHARGEABLE [11 U.S.C. § 523(a)(2); 523(a)(6)].** |

////

**COME NOW** plaintiffs and creditors, KI HYUNG OH and JAI HEE OH, hereinafter collectively cited as plaintiff and allege as follows

### GENERAL ALLEGATIONS

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 as a civil proceeding arising under Title 11, or arising in or relating to a case under Title 11. This adversary

1. proceeding is brought under sections 523 and 727 of Title 11. This is a core proceeding under 28 U.S.C. § 157(b)(2), subparts (E), (F), (H) and (I).

2. KI HYUNG OH and JAI HEE OH are husband and wife. KI HYUNG OH was the primary borrower, and JAI HEE Oh was the guarantor, of a loan provided by Bank of Hope, for OH's purchase of a business known as Maxwell The Cleaners ("MAXWELL"), located in Larkspur, California. The purchase price was $1.305 million. Oh made the down payment of $499,495.00 with his own funds and accepted owner financing of $100,000.00 from YOON.

3. MAXWELL was a retail dry cleaners which had on-site dry cleaning equipment. Such dry cleaners are commonly referred to as a "PLANT." A dry cleaner which only has drop-off and pick-up is known as an "AGENCY." The purchase price of a PLANT facility is usually far more expensive than an AGENCY, often 2 to 3 times higher, or more. BHAK had opined that MAXWELL would be worth about $500,000 or less if it were merely an AGENCY. MAXWELL had Same Day Service and another important, unique convenience features, such as Drive-Thru for drop-off and pick-up for customers.

4. The debtor, TEA SUN YOON ("YOON"), was the owner-seller of MAXWELL. YOON is highly experienced in transactions involving dry cleaners, including the nuances of 1031 exchanges and was aware that the sale of MAXWELL was conditioned upon a successful transfer of his leasehold interest to OH.

5. Allen Bhak, individually and doing business as Cosmopolitan Realty, ("BHAK") is a well-known business broker in the Korean-American community, particularly for transactions of dry cleaners. BHAK had acted as YOON's agent when YOON purchased MAXWELL about 10 years ago. BHAK was the broker representing both YOON and OH in this transaction.

6. Bank Of Hope ("BANK") facilitated OH's purchase of MAXWELL from YOON by providing financing of $745,000 to OH. Such financing was conditioned upon, *inter alia*, a valid assignment of the MAXWELL Lease from YOON and MCM to OH. BANK's primary customer base is Korean-Americans in the Bay Area and throughout California.

7. Marin Country Mart, LLC ("MCM" or "Landlord") was and is the owner of the real property in which MAXWELL is located. James Rosenfield is the "managing officer" who acted on behalf of MCM during the relevant times. OH is informed and believes that MCM is a California limited liability company.

8. The MAXWELL Lease was initially entered into on or about September 15, 1990. OH is informed and believes and herein alleges that the operative lease had been amended three (3) times, most recently in August 28, 2015 with the lease extended to expire on September 30, 2020 with one 5-year option that would extend the Lease through September 2025. YOON intended to transfer his leasehold interest in the August 28, 2015 amended Lease to OH. The September 15, 1990 Lease together with Amendment dated August 28, 2015, are herein collectively referred to as "Lease."

9. Green Escrow ("ESCROW") acted as the business escrow and was hired by both OH and YOON. ESCROW and BHAK had many previous business dealing prior to MAXWELL, and ESCROW and its employees were beholden to BHAK, bending over backwards to accommodate BHAK and obeyed BHAK's instructions, sometimes blindly to its peril and to the harm to its clients, such as OH.

10. Kathy Lazano ("LAZANO") is an agent and employee of ESCROW and was the escrow officer who provided hands-on escrow services, including preparation of all documentation and their execution by OH and YOON, required for successful closing of the transaction. LAZANO is highly experienced in business escrow and appreciated the importance of the Lease Assignment in this transaction. Specifically, she knew that the successful transfer of the Lease from YOON to OH was an essential pre-condition to closing the escrow.

11. OH, YOON, BHAK, and the BANK employees involved in this transaction are all Korean-Americans and they communicated among themselves in Korean. Relevant documents were sometimes translated into Korean and summarized in Korean for the benefit of OH.

12. On or about October 10, 2016, BHAK solicited OH to make an offer to purchase MAXWELL. But this offer expired without a response from YOON.

13. Then on or about October 24, 2016, YOON made an offer to sell MAXWELL to OH. BHAK solicited this offer from YOON and presented it to OH.

14. On November 10, 2016, OH and YOON executed Seller's Counter Offer to the October 24, 2016 offer. Thus, a fully enforceable contract was entered into by and between OH and YOON. The YOON offer and the OH counteroffer constitute the Business Purchase Agreement ("BPA").

15. A most important provision in the BPA was Paragraph 12, on Page 4, which states in part:

> "12 LEASE (Check applicable items): The sale is contingent upon
> BUYER obtaining within 21 DAYS After Acceptance the assignment,
> new lease, option to extend, sublease or other lease as indicated below."

16. In other words, OH and YOON intended OH to seek and receive from MCM the assignment of YOON's leasehold interest in MAXWELL, for a leasehold running until September 30, 2025.

17. As is customary in any business transaction, including dry cleaners, the Seller (YOON) and/or the broker ("BHAK") ordinarily makes the initial outreach to the Landlord regarding the possible assignment and required transfer of the Lease, for the benefit of parties to the transaction. It is customary that the broker would do the actual legwork to facilitate this process, including preparing and transmitting a Lease Assignment for the parties and the Landlord to review and sign. Pursuant to the Lease, the Landlord's consent could not be unreasonably withheld.

18. At all times, OH believed BHAK had properly carried out his duties to obtain MCM's consent to the assignment of the Maxwell Lease. He had no inkling of any issues with or defects in the Lease Assignment. OH proceeded to close escrow under this belief, which turned out to be a grave mistake, as described below.

19. Bank made it known that a condition of its funding of the purchase money loan was the valid assignment of the Lease to OH with MCM's consent. As a part of the loan transaction, on or about December 9, 2016, and prior to close of escrow, BANK requested a copy of the Lease from MCM. Apparently, this inquiry went ignored and there was no further follow-up by the BANK.

20. On or about December 27, 2016, BHAK, the fiduciary and dual agent, after repeated requests from the BANK, provided BANK with a signed document entitled "Lease Assignment."

21. Escrow closed on January 6, 2017. OH signed the escrow documents under the mistaken belief that all the conditions for closing had been met, including the Landlord's signature and consent to a valid Lease Assignment. Based on the mistaken belief that the Landlord had signed and consented to the Lease Assignment, Bank wired the loan proceeds to ESCROW prior to the closing. ESCROW in turn closed the transaction and delivered $1,305,000 to YOON; and YOON executed a bill of sale and other closing documents, purporting to convey his interests in MAXWELL to OH.

22. Unbeknownst to OH, at the time of closing, the Landlord's signature on the Lease Assignment was not genuine. Someone had forged the Landlord's signature. OH did not discover the forgery until after the closing, in late January 2017, when OH met the Landlord by happenstance after close of escrow. At that time, Landlord informed OH for the first time that the Landlord had not consented to the transfer of the Lease from YOON to OH and had not signed the Lease Assignment, which was a condition precedent to closing escrow and the funding of the Bank loan.

23. OH is informed and believes and thereon alleges that, before the closing, YOON became aware in late December 2016 or early January 2017 that YOON's purported signature on the Lease Assignment had been forged; and YOON so informed ESCROW. However, YOON did not inform OH of the fact that he, YOON, had not signed the Lease Assignment, which was undoubtedly a fact material to the transaction. OH is further informed and believes and thereon alleges that YOON either knew or was substantially certain that the Landlord's signature on the Lease Assignment was also forged, and further knew or was substantially certain that the Landlord would not consent to OH taking over the premises and would not consent to the continued operation of a PLANT in premises. YOON communicated none of those things to OH and proceeded to close the sale to OH knowing or substantially certain that he could not and would not be able to convey to OH all of the benefits under the BPA that OH was purchasing for $1,305,000.00.

24. Further unknown to OH at the time of closing, OH is informed and believes and thereon alleges that, on or about January 3, 2017, BHAK instructed ESCROW and LAZANO to prepare a secret document, Amended Escrow Instructions, without the knowledge of OH, to be used as a defense to any claims against BHAK and ESCROW in the event that Landlord's forged signature became an issue. The Amended Escrow Instructions purported to waive the requirement in the BPA that YOON deliver to OH a Lease Assignment as a condition of the sale.

25. Even though the Amended Escrow Instructions were never properly a part of the transaction between OH and YOON, because OH never agreed to waive the Lease Assignment requirement, LAZANO instructed OH to sign the Amended Escrow Instructions when OH went to sign escrow documents, as one of the many, many pages of closing documents that LAZANO presented to OH, pointing to multiple places where OH was to sign; all without giving OH any explanation, translation or notice of what OH was signing. In so doing, YOON, LOZANO, ESCROW and/or BHAK fraudulently induced OH to sign the Amended Escrow Instructions which purported to waive the requirement of a Lease Assignment, and close the sale, even though OH was not going to receive what he thought he was buying.

26. Plaintiffs are informed and believe and thereon allege that the only reason for the preparation of the Amended Escrow Instruction was that YOON, BHAK, ESCROW and LAZANO, and each of them, knew that the Lease Assignment that they had shown to OH and sent to the BANK was neither enforceable nor legitimate. At no time did YOON, BHAK, ESCROW nor LAZANO, nor any one of them, inform OH of any defect in the Lease Assignment. Although BHAK, ESCROW and LAZANO sent the Lease Assignment to BANK, they did not send the BANK the Amended Escrow Instructions, with the obvious consequence that the BANK and OH were unaware that the $1,305,000.00 in purchase money would not buy MAXWELL, with an operable PLANT and a lease through September 2025.

27. After the closing, on or about February 1, 2017, Landlord, through its lawyer, sent a Notice Of Non-Curable Default to YOON, in which it asserted that YOON's assignment of the Lease without Landlord's consent was a non-curable lease default which entitled the Landlord to

terminate the Lease. The specific Lease language that the Landlord cited was from Section 11 of the Lease, stating:

> Tenant shall not sublet or assign this lease, whether in whole or in part, or any interest therein, without first obtaining Landlord's written consent, which said consent shall not be unreasonably withheld .... Any assignment or sublease in violation of this Lease shall, at the option of the Landlord, be voidable.

28. The Notice of Non-Curable Default further provided:

> Your assignment of the Lease, without notifying landlord and without obtaining landlord's prior written consent. constitutes a non-curable default under the terms or the Lease, which entitles landlord to terminate the Lease. Landlord hereby elects to terminate the Lease.

29. Landlord contended that the wrongful attempt to assign the Lease was a "non-curable default" even though the contractual cure for the wrongful attempt to assign the Lease, elective voidability, was in the very same Lease provision actually cited by the Landlord.

30. Subsequent to close of escrow, after learning that the Landlord denied having consented to the Lease Assignment, OH tried in vain to negotiate with Landlord, including a request for consent to the assignment of the Lease, ratification of the assignment, or a new lease. The Landlord refused all such requests. OH further attempted but was not able to find a different location for MAXWELL within the shopping center. YOON, through his attorney at the time, also tried to persuade the Landlord . . . all to no avail.

31. Upon learning from the Landlord of the defective Lease Assignment, OH immediately demanded that YOON agree to rescind the transaction. YOON refused. OH again offered to rescind after his efforts to mitigate damages with the Landlord failed. YOON again refused to rescind. At the time of the rescission offer, OH was still in possession of the MAXWELL premises and the transaction between the parties could have been unwound.

32. Despite the fact that YOON did not deliver to OH what OH had purported to purchase, YOON has failed and refused to return to OH the money that OH paid for MAXWELL, which included an assignment of the Lease and the ability to operate the PLANT through September 2025.

33. On August 30, 2017, BANK sued KI HYUNG OH, JAI HEE OH, YOON, BHAK and ESCROW in the Marin County Superior Court in the case of *Bank of Hope v. Oh, et al.*, Case No. CIV 1703210, seeking the return of the purchase money it had loaned to OH.

34. On October 9, 2018, plaintiffs filed a cross-complaint in the Marin County action against YOON and others; and plaintiffs filed a First Amended Cross-Complaint on February 7, 2019. Plaintiffs' cross-complaint alleged that YOON were indebted to plaintiffs in the amount of $1,305,000.00.

35. On November 20, 2018, YOON filed a cross-complaint against OH and others. However, on January 15, 2020, the Marin County Superior Court entered its Order Issuing Terminating Sanctions Against Tea Sun Yoon ("Order"). That Order struck YOON's cross-complaint, struck YOON's answer to plaintiffs' cross-complaint, and entered YOON's default on the plaintiffs' cross-complaint. The Order also prohibits YOON from refiling his cross-complaint, as one of the terminating sanctions against YOON. The Order Issuing Terminating Sanctions Against Tea Sun Yoon became a final and unappealable order on March 16, 2020, when Yoon's deadline to appeal that Order passed.

36. The Order functions as a judgment against Yoon on his own cross-complaint. *Cal. Code Civ. Proc.*, §581d. The Order also entitles plaintiffs to have a default judgment entered against YOON in the amount of $1,305,000.00 on plaintiffs' cross-complaint. *Sass v. Cohen* (December 24, 2020) --- P.3d ----, 2020 WL 7653773 citing: *Title Ins. & Trust Co. v. King Land & Improv. Co.* (1912) 162 Cal. 44, 46 ["'A default confesses all the material facts in the complaint'"]; 7 Witkin, *Cal. Procedure* (5th ed. 2019) Proceedings Without Trial, § 176 ["the defendant's failure to answer has the same effect as an express admission of the matters well pleaded in the complaint"].

37. Because of the Marin County Superior Court's Order of January 15, 2020, it is without dispute that OH does **not** owe any amount to YOON; and, therefore, YOON's Schedule A/B, filed October 8, 2020 is patently false in alleging in paragraph 30 that "Ki Oh [owes YOON] for loan of $100,000 made in or about February 2017". Likewise, Yoon's Schedule E/F is patently false in alleging that plaintiffs' claims are "contingent", "unliquidated" and "disputed". The Order Issuing

Terminating Sanctions Against Tea Sun Yoon establishes YOON's liability to plaintiffs at $1,305,000.00, the amount alleged in plaintiffs' cross-complaint. The debt is neither contingent, unliquidated nor disputed. Collateral estoppel forbids YOON from relitigating his liability to plaintiffs and from relitigating his purported claim against OH. See, *Sasson v. Sokoloff* (*In re Sasson*), 424 F.3d 864, 870 (9th Cir. 2005), quoting *Grogan v. Garner*, 498 U.S. 279, 284 n.11 (1991) ["The Supreme Court has stated that 'collateral estoppel principles do indeed apply in discharge exception proceedings pursuant to § 523(a).'"]

## FIRST CLAIM FOR RELIEF
(Denial of Discharge)

38. By this reference, plaintiff incorporates and realleges, as though fully set forth, the allegations of paragraphs 1 through 37, inclusive.

39. As alleged above, YOON has sought to falsely disclose his assets and liabilities in filing his schedules. YOON has "knowing and fraudulently, in connection with the case— (A) Made a false oath or account". 11 *U.S.C.* § 727(a)(4).

40. The debtor signed his schedules under oath knowing that he had not truthfully disclosed all of his assets and liabilities with respect to plaintiffs. He falsely represented that OH owed him $100,000, when he knew unequivocally that the Marin County Superior Court had thrown out that claim and OH owes him nothing. The debtor also falsely asserted in his schedules that his debt to plaintiffs is "contingent", "unliquidated" and "disputed", when he knows unequivocally that the Marin County Superior Court has precluded YOON from disputing that he owes plaintiffs $1,305,000.00.

41. Defendants' conduct as described above was knowing and fraudulent, requiring the Court to deny discharge pursuant to 11 U.S.C. § 727(a)(4).

## SECOND CLAIM FOR RELIEF
(Non-Dischargeability—523(a)(2))

42. By this reference, plaintiff incorporates and realleges, as though fully set forth, the allegations of paragraphs 1 through 41, inclusive.

43. Title 11 U.S.C. § 523(a)(2) provides that a debtor is not discharged from any debt incurred through fraud or false pretenses. As alleged hereinabove, YOON knew or should have known of the forged Lease Assignment and knew or should have known that plaintiff was fraudulently induced to sign the Amended Instructions. YOON directly and unequivocally benefited financially from that fraudulent conduct by receiving $1,305,000.00 while not being able to deliver to OH what OH had agreed to purchase. It is not necessary to prove whether YOON himself committed the fraudulent acts by which he obtained the $1,305,000.00, it is sufficient that YOON knew or should have known of the fraud and obtained substantial financial benefit from it. *In re Huh,* 506 B.R. 257, 271-272 (9th Cir. BAP 2014.

44. Plaintiff seeks a declaration of this Court that the obligation due and owing to plaintiff from defendant, as alleged above, was obtained by fraud and constitutes a debt that is not dischargeable in bankruptcy, pursuant to 11 U.S.C. § 523(a)(2).

### THIRD CLAIM FOR RELIEF
(Non-Dischargeability—523(a)(6))

45. By this reference, plaintiff incorporates and realleges, as though fully set forth, the allegations of paragraphs 1 through 44, inclusive.

46. "Conversion is the wrongful exercise of dominion over the property of another. The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages." *Lee v. Hanley* (2015) 61 Cal.4th 1225, 1240. When a conversion is done willfully and maliciously, and not merely recklessly or negligently, it is considered a "willful and malicious injury" that is not dischargeable in bankruptcy, pursuant to 11 U.S.C. § 523(a)(6). *In re Peklar*, 260 F.3d 1035, 1038 (9th Cir. 2001).

47. Here, YOON took possession of plaintiff's money through the wrongful acts of YOON or others in forging the Landlord's signature on the Lease Assignment and by fraudulently obtaining OH's signature on the Amended Instructions. Then, YOON willfully and maliciously kept and refused to return OH's money after the forgery and deceit came to light. With it obvious and

apparent to all concerned that YOON could not deliver to OH what he had promised to sell to him, YOON made the intentional and malicious decision to keep and refuse to return OH's money, knowing that he (YOON) had only obtained that money through fraudulent acts, whether his acts or those of his agents.

48. Plaintiff seeks a declaration of this Court that the $1,305,000 that YOON converted from plaintiff, as alleged above, was obtained by willful and malicious wrongful acts and constitutes a debt that is not dischargeable in bankruptcy, pursuant to 11 U.S.C. § 523(a)(6).

**WHEREFORE**, plaintiff demands relief against defendants on each claim for relief, as follows:

1. For a declaration that the debtor is not entitled to a discharge of any of his debts, pursuant to 11 U.S.C. § 727(a)(4);
2. For a declaration that the debt of YOON to plaintiffs, in the amount of $1,305,000.00 is not dischargeable, pursuant to 11 U.S.C. § 523(a)(2);
3. For a declaration that the debt of YOON to plaintiffs, in the amount of $1,305,000.00 is not dischargeable, pursuant to 11 U.S.C. § 523(a)(6);
4. For costs of suit herein; and,
5. For such other and further relief as the Court deems just and proper.

DATED: December 29, 2020.  LEADER-PICONE & YOUNG, LLP

BY: /s/ 
MALCOLM LEADER-PICONE
Attorneys for Plaintiffs
KI HYUNG OH and JAI HEE OH

# **COURT SERVICE LIST**

Tea Sun Yoon
1515 Geary Road, Suite 214
Walnut Creek, CA  94597

Tea Sun Yoon
5717 Makati Circle, Apt. A
San José, CA  95123

Stanley A. Zlotoff, Esq.
Law Offices of Stanley A. Zlotoff
300 S 1st Street, #215
San José, CA  95113
<zlotofflaw@gmail.com>

Gregg S. Kleiner, Esq.
Rincon Law LLP
268 Bush Street, #3335
San Francisco, CA  94104
<gkleiner@rinconlawllp.com>

**COURT SERVICE LIST**